UNITED STATES of America, Plaintiff,

v.

Kenneth TOWNSEND, et al., Defendants.

No. 77–502–Cr–WMH.

United States District Court, S. D. Florida, Miami Division.

July 29, 1981.

Stephen B. Gillman, Asst. U. S. Atty., Miami, Fla., for plaintiff.

William Moran, Miami, Fla., for defendant.

HOEVELER, District Judge.

## I. INTRODUCTION

In November of 1977, a Grand Jury delivered a thirteen-count indictment against defendant Kenneth Townsend and six other individuals. Townsend was named only in Count I of the indictment, a count which charged that Townsend, his six co-defendants and three unindicted co-conspirators willfully, knowingly and unlawfully conspired (1) to possess a firearm, more specifically, a destructive device, which was not made in compliance with the provisions of 26 U.S.C. § 5822, in violation of 26 U.S.C. § 5861(c); (2) to possess a firearm, more specifically, a destructive device, which was not registered to any of the named conspirators in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. § 5861(d); and (3) to make a firearm, more specifically, a destructive device, without complying with the provisions of 26

U.S.C. § 5822, in violation of 26 U.S.C. § 5861(f). Section 5822 of Title 26 of the United States Code provides that no person shall make a firearm without (a) filing with the Secretary of the Treasury a written application to make and register the firearm; (b) paying the applicable tax on the firearm; (c) identifying the firearm to be made; (d) identifying the maker of the firearm; and (e) obtaining the approval of the Secretary of the Treasury to make and register the firearm.

Townsend was tried separately on the conspiracy count in a bench trial which commenced in October of 1980. In the latter part of that month, after each side had presented its case and brief closing arguments were made by counsel, the trial was completed, although no verdict was announced at that time. In April of 1981, following a series of postponements, the trial was reconvened for one day for the purpose of hearing more extensive closing arguments. As the Court now has determined that defendant Kenneth Townsend is guilty beyond a reasonable doubt of conspiring to violate those provisions of Title 26 of the United States Code set forth in Count I of the indictment, this memorandum opinion is entered in order to present the Court's findings of fact and conclusions of law with respect to that determination.

## II. FACTUAL BACKGROUND

With one admittedly significant exception, the factual circumstances which gave rise to this criminal action were largely undisputed throughout the trial of this case. To recapitulate those facts which are relevant to this opinion, it is necessary to review events which occurred in 1974, a year in which Townsend shared a townhouse apartment with co-defendant, Paul David Jacobson. One evening in September of 1974, Jacobson and two unindicted co-conspirators, Nathan Brooks Wood and Robert John Lowney, agreed to, and did in fact, steal dynamite from the Austin Powder Company in south Florida. Austin Powder had previously employed Nathan Wood, and he was familiar with the company's security

arrangements. Furthermore, Wood, while employed at Austin, had been issued licenses which permitted him to handle explosives, and his job experience included detonation tasks. Although Townsend was unaware of the scheme which resulted in the dynamite theft, he was cognizant of Wood's familiarity with explosives. Wood was not licensed to handle explosives at the critical times herein.

The burglary trio removed one box of dynamite and one box of blasting caps from Austin Powder Company and returned with those items to the Townsend-Jacobson residence. Upon arrival at the townhouse, the blasting caps were separated from the dynamite for safety reasons, and the box of dynamite carried into the kitchen. In order to thwart any subsequent tracing of the dynamite to Austin Powder Company (and presumably thereafter to Wood), a decision was made to cut up and repackage the stolen explosives. Townsend who appeared in the kitchen following the arrival of Jacobson, Wood and Lowney, was instructed to obtain containers to hold the newly-acquired dynamite. Although late in the evening, Townsend left the apartment upon receiving this instruction, and he located and purchased approximately one dozen assorted plastic containers with his own funds. Townsend completed this chore without objection, fully aware that the containers he provided would be utilized to store dynamite. Moreover, although Townsend was not implicated in the dynamite theft, he admitted that he knew Jacobson, Wood and Lowney "didn't buy it."

Following Townsend's return to the apartment, the containers purchased by Townsend were taken over by Wood and Lowney who completed the repackaging of the Austin explosives that same evening. In several of the containers holding the repackaged dynamite, roofing nails were inserted in order to produce a "shrapnel effect" when the dynamite was later put to use. Although both Wood and Lowney testified at trial that nails were deposited in some of the containers, Townsend, who took the stand in his own behalf, stated that he

had not observed any nails during the course of the evening in question. Wood testified, however, that Townsend probably purchased the nails when he obtained the plastic containers and that Townsend knew they were to be placed with the dynamite. As Wood's statements in this regard, as well as Lowney's, are deemed to be credible, the testimony supports a finding that nails were mixed with the unwrapped dynamite and that Townsend knew of this arrangement regardless of whether he had been the actual purchaser of the nails. On redirect testimony, Wood, upon being refreshed by a state deposition he had given in August of 1977, stated that defendant Townsend picked up the roofing nails and that he was present when the nails were put in the dynamite and when a discussion by others occurred regarding the use of the nails. Townsend did not participate further in the repackaging process, however, other than to supply the necessary containers, and his presence in the kitchen during the repackaging was brief since he found the fumes emanating from the explosives to be objectionable (as did Jacobson who also left).

When the repackaging operation was completed, the filled containers were placed in a suitcase and several days later were taken to Wood's house where they were buried. Only Jacobson, Wood and Lowney knew of the storage location. Later in September, however, Townsend, Jacobson and Wood met at a bar, which meeting resulted in a short trip for the purpose of testing the stolen dynamite. Townsend drove the group in his car to a wooded location for the proposed trial run. A tree was designated as the test subject, and Townsend raised the automobile hood so that the car battery could be employed as the power source for the explosion. Apparently disappointed with the size of the blast which resulted, Jacobson asked Wood if the dynamite "could do a car."

Following the testing episode, Jacobson and others, not including Townsend, participated in a variety of criminal activities involving explosives. One such incident was the October, 1974, attempted murder of Stuart Goldman, an individual who survived the detonation of a homemade dynamite bomb attached to his car. Although there is no significant evidence that Townsend had prior knowledge of the Goldman murder attempt which was conceived by Jacobson, Townsend did participate after the Goldman bombing in an extortion scheme which was contrived to divert attention from Jacobson as a suspect. Despite the presentation of additional evidence of other criminal acts perpetrated by the Jacobson group through the use of explosives, no other indication of Townsend's involvement with the explosives at issue in this case appeared at trial.

## III. CONCLUSIONS OF LAW

Defendant Townsend argues that the explosive involved in this case, commercial dynamite, cannot be defined as a destructive device under 26 U.S.C. § 5845(f) and therefore, is not a "firearm" under 26 U.S.C. § 5861. Additionally, the defendant contends that as he did not agree to participate in the conspiracy as charged, he cannot be found guilty under Count I of the indictment. These two contentions will be addressed separately.

### A. Destructive Devices

■ The defendant was indicted under 26 U.S.C. §§ 5861(c), (d) and (f) which provide as follows:

It shall be unlawful for any person... (c) to receive or possess a firearm made in violation of the provisions of this chapter; or (d) to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or

.    .    .    .    .

(f) to make a firearm in violation of the provisions of this Chapter...

The term "firearm" is defined for purposes of the present case under § 5845(a) which states as follows:

(a) Firearm.—The term "firearm" means ... (8) a destructive device.

A destructive device is defined in pertinent part in §§ 5845(f)(1) and (3):

(f) Destructive device.—The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one quarter ounce, (E) mine, or (F) similar device; . . . . and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in [subparagraph] (1) . . . and from which a destructive device may be readily assembled.

In brief, if a device is not inherently a destructive device under § 5845(f)(1), it may be proven that a combination of parts would create a destructive device as defined by (f)(1), pursuant to § 5845(f)(3).

Defendant argues that commercial dynamite is not a destructive device as contemplated by the definitional provisions of § 5845(f) of Title 26. In support of this argument, defendant relies most heavily upon the opinion rendered in *United States v. Posnjak*, 457 F.2d 1110 (2d Cir. 1972), a case which held that unaltered commercial dynamite is excluded from the statute in question. The Fifth Circuit addressed the *Posnjak* position in *United States v. Wilson*, 546 F.2d 1175 (5th Cir. 1977), and reached the following conclusion:

> We disagree with defendant's contention that the explosive device used by him was beyond the reach of the statute. We could accept this conclusion only if we find that no device in which dynamite was the explosive material could constitute a statutory "destructive device" or bomb.
> . . . The purpose of the statute would be defeated by any interpretation which excluded from coverage homemade bombs having no lawful use, simply because one of the components was dynamite, a material not in itself regulated as a firearm.

*Id.* at 1177.

Other circuits have reached a similar conclusion in cases involving dynamite in its commercial form by reasoning that otherwise innocent items may become destructive devices depending upon the user's intent and activity. *See, e. g., United States v. Morningstar*, 456 F.2d 278 (4th Cir.) *cert. denied*, 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972); *United States v. Oba*, 448 F.2d 892 (9th Cir.), *cert. denied*, 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972); *Langel v. United States*, 451 F.2d 957 (8th Cir. 1971). A recent district court opinion, with which this Court agrees, summarizes the apparent prevailing view in this regard in the following manner:

> [C]ommercial sticks of dynamite used for their intended purpose of blasting rocks cannot be viewed as destructive devices. The Court, however, must agree with the majority of the circuits that Congress intended to include within the term "destructive device" the combination of commercially usable sticks of dynamite, wires and electric blasting caps when used or intended to be used for antisocial purposes. Although the word "bomb" found in (f)(1) is not defined in the statute, a common definitional use of the word would include within it the above components when intended to be employed for purposes other than legitimate blasting. The Court cannot perceive how such a device used with evil intent could not be one "designed or redesigned for use as a weapon" as required under (f)(3).

*United States v. Russell*, 468 F.Supp. 322, 328 (S.D., Tex.1979).

In the instant case, a quantity of dynamite was stolen, repackaged, and enhanced with roofing nails. As such, the dynamite in question cannot be characterized as having other than an antisocial purpose. Thereafter, the defendant accompanied two others to a secluded location where some of the dynamite previously referred to and a blasting cap were assembled and exploded with the aid of the car battery and starter. Based upon the foregoing, the Court concludes that the assembled components which were tested by Townsend and others constituted a "bomb" and therefore fall within the definition of "destructive device" set forth in § 5845(f)(1). Further, the Court also concludes that with blasting caps

close at hand and only the need of a car battery to provide a power source, the dynamite present at Townsend's apartment the night it was stolen and repackaged qualifies as a "destructive device" under (f)(1) as well. Even assuming that the unassembled parts fall outside the scope of (f)(1), the dynamite, nails, and blasting caps clearly constituted a "combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled" under (f)(3).

Additionally, this Court notes that even if the *Posnjak* court were correct in its statutory interpretation of § 5845(f), the reasoning of that court would offer defendant Townsend no relief in the case at bar, for the addition of the roofing nails to the dynamite transformed it into a destructive device. Thus, even if alteration of dynamite is required in order for that substance to fall within the parameters of § 5845 as suggested in *Posnjak*, that criteria is met here.

In sum, under the circumstances of this case, the decisional law clearly indicates that the explosive at issue qualifies as a destructive device.

## B. *Conspiracy*

■ One of the guiding principles of conspiracy law is that one does not become a co-conspirator simply by virtue of knowledge of a conspiracy and association with conspirators. *United States v. Falcone*, 311 U.S. 205, 61 S.Ct. 204, 85 L.Ed. 128 (1940); *United States v. Grassi*, 616 F.2d 1295 (5th Cir. 1980); *United States v. Barrera*, 547 F.2d 1250 (5th Cir. 1977). To connect a defendant to a conspiracy, the prosecution must demonstrate that the defendant either expressly or tacitly agreed with others to join the conspiracy and participate in the achievement of the illegal objective. *United States v. Avila-Dominguez*, 610 F.2d 1266 (5th Cir. 1980). While no formal agreement nor direct evidence is necessary to establish a conspiracy, *Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), there must be proof

beyond a reasonable doubt that a conspiracy existed, that the defendant knew it, and with that knowledge intentionally did something to further that conspiracy. *Causey v. United States*, 352 F.2d 203 (5th Cir. 1965).

■ The evidence before the Court in the instant case is, in most parts, not of a conflicting nature. Townsend admitted that he purchased containers for the repackaging of dynamite obtained by co-conspirators Jacobson, Wood and Lowney and that he assisted in the subsequent testing of that dynamite by driving Jacobson and Wood to a secluded location and raising the hood of his car in order to arm the device by wiring it to the car battery. He testified, however, that he only drove the others because of "curiosity." Moreover, while Townsend did not participate in the stealing of the dynamite, he acknowledged that he knew Jacobson, Wood and Lowney "didn't buy it." Further, although Townsend may not have known of or participated in the incidents for which the explosives ultimately were utilized, he did engage in coverup activities related to at least one of these episodes. Clearly, Townsend's involvement was more than that of "mere presence" or "mere association."

The Court therefore concludes that a conspiracy to violate § 5861 of Title 26 of the United States Code existed, that defendant Townsend knew of it, and that armed with that knowledge, he committed acts which furthered the conspiracy. While Townsend's role may have been a minor one, it does not relieve him of criminal responsibility. *See generally, United States v. Alvarez*, 625 F.2d 1196 (5th Cir. 1980); *United States v. Macker*, 608 F.2d 223 (5th Cir. 1979).

## IV. CONCLUSION

Defendant Kenneth Townsend was indicted for conspiracy to violate 26 U.S.C. §§ 5861(c), (d) and (f). Section 5861(c) provides that it is unlawful to possess a firearm made contrary to § 5822, the pertinent text of which was previously set forth in this opinion; Section 5861(d) makes it unlawful to possess an unregistered firearm;

and Section 5861(f) provides that the making of a firearm without compliance with the provisions of § 5822 shall be prohibited. Certificates of non-registration provided by the government in this case indicate that the "firearm" in question was not registered as required by Title 26.

Based upon this Court's determination that the explosive in the instant case is a destructive device as defined by 26 U.S.C. § 5845(f), and based upon this Court's conclusion that Townsend intentionally furthered a conspiracy which he knew existed, the Court finds that the evidence compels the conclusion that defendant Kenneth Townsend is guilty beyond a reasonable doubt of conspiring to violate 26 U.S.C. §§ 5861(c), (d) and (f) as alleged in Count I of the indictment.