**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Larry J. COPUS, Defendant–Appellant.**

No. 95–1385.

United States Court of Appeals,
Seventh Circuit.

Submitted Jan. 11, 1996.

Decided Aug. 8, 1996.

Larry Wszalek (submitted), Office of the U.S. Atty., Madison, WI, for Plaintiff–Appellee.

Reesa Evans, Madison, WI, for Defendant–Appellant.

Before ESCHBACH, COFFEY and EVANS, Circuit Judges.

COFFEY, Circuit Judge.

While investigating a domestic dispute, law enforcement authorities discovered an assortment of guns, grenades, and detonators in Larry Copus' residence. Copus was charged in a three-count indictment with various weapons violations. Count I charged Copus with unlawfully possessing a machine gun, in violation of 18 U.S.C. § 922(*o*)(1). Count II charged Copus with unlawfully possessing a silencer, in violation of 26 U.S.C. § 5861(d). Count III charged him with unlawfully manufacturing a firearm, in violation of 26 U.S.C. § 5861(f). A jury convicted Copus on all three counts, and the district court sentenced

him to 97 months' imprisonment to be followed by a three-year term of supervised release. In this appeal, Copus challenges: the sufficiency of the evidence to convict him under Count III, the district court's decision to add six points to his base offense level for manufacturing fifty or more "destructive devices," and the constitutionality of the statutes under which he was prosecuted. We affirm.

## I. BACKGROUND

Defendant Larry J. Copus resided with his wife and children in Edgerton, Wisconsin. On March 13, 1994, several police officers were dispatched to Copus' residence in response to a call from Copus that his wife had held a gun on him and threatened him. By the time the officers arrived, Copus had taken the handgun from his wife and she had fled the house. Copus' daughter informed the officers that another handgun was involved in the dispute.

In the process of searching the house for the other handgun, one of the officers discovered a rifle with a silencer in a gun case that had been converted into a machine gun. The officers also found a toolbox that contained twenty-seven shell casings. These shell casings had been converted into improvised detonators. The shell casings had been filled with explosive powder and then epoxied shut. Each detonator had a fuse attached to the shell casing. The toolbox also contained three hand grenade bodies, various hand grenade parts and explosive mixtures.

Not surprisingly, these discoveries led to further investigation of Copus. The Bureau of Alcohol, Tobacco, and Firearms searched Copus' residence and found explosive powder, U.S. military manuals detailing the manufacture of explosive devices and incendiary charges, and an improvised incendiary device. Still further investigation led authorities to a storage locker rented by Copus. In the storage locker, they found two pipe bombs made from 1/2–inch by 8–inch steel pipe in addition to four assembled hand grenades with pyrotechnic fuse protruding from the detonator assembly. Each of the four hand grenades and two pipe bombs were

fitted with an improvised detonator similar to those recovered from Copus' residence. Also found in the storage locker were an additional twenty-three improvised detonators. Copus told authorities that he used the various devices found in his possession for blowing up stumps.

## II. ISSUES

On appeal, Copus raises three issues. First, Copus challenges the sufficiency of the evidence to support the jury's verdict that he unlawfully manufactured "destructive devices," as that term is defined in the National Firearms Act, ch. 757, 48 Stat. 1236 (1934) (codified as amended at 26 U.S.C. §§ 5801 *et seq.*). Second, Copus argues that the district judge erred by increasing his offense level pursuant to U.S.S.G. § 2K2.1(b) based on a finding that Copus' offense involved fifty or more "destructive devices." Third, Copus challenges the constitutionality of the statutes under which he was prosecuted. He claims that the Supreme Court's decision in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), renders invalid his conviction under 18 U.S.C. § 922(*o*) for the possession of a machine gun. He also claims that the provisions of the National Firearms Act under which he was convicted cannot be justified on the basis of either the Commerce Clause or Congress' taxing power.

## III. DISCUSSION

### A. Sufficiency of the Evidence

Count III of the indictment charged Copus with unlawfully making a "destructive device," in violation of 26 U.S.C. § 5861(f).[1] Copus maintains that there was insufficient evidence to support a verdict that his homemade detonators constituted "destructive devices" as that term is defined in the National Firearms Act. The National Firearms Act defines a "destructive device" as:

1. Section 5861 provides: "It shall be unlawful for any person ... (f) to make a firearm in violation of the provisions of this chapter." A "firearm" is defined to include a "destructive device." 28 U.S.C. § 5845(a)(8). A person may lawfully make a firearm only if he obtains ap-

(1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellant charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device;

. . . . .

(3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

26 U.S.C. § 5845(f). Congress specifically excluded from the above definition "any device which is neither designed nor redesigned for use as a weapon." *Id.*

■■■ When considering a challenge on direct appeal to the sufficiency of the evidence to sustain a conviction, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). "[O]nly when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt" may a conviction be reversed. *United States v. Johnson,* 26 F.3d 669, 684 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994). In this case, Copus failed to move for a judgment of acquittal either at the close of the evidence or within the seven-day period following the verdict, Fed.R.Crim.P. 29. This failure results in the waiver of any challenge on appeal to the sufficiency of the evidence absent a manifest miscarriage of justice. *United States v. Archambault,* 62 F.3d 995, 998 (7th Cir.1995); *United States v. Baker,* 40 F.3d 154, 160 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 237 (1995).

proval from the Secretary of the Treasury, 26 U.S.C. § 5822, and pays a $200 tax, 26 U.S.C. § 5821. It is undisputed that Copus neither obtained the necessary approval nor paid the required tax.

We believe that no manifest miscarriage of justice results from sustaining the verdict on Count III. Under § 5845(f)(1), a destructive device includes "any explosive ... bomb ... or ... similar device." The government presented evidence that the home-made detonators were fully assembled devices, each consisting of (1) a metal casing containing explosive powder that was epoxied shut and (2) a fuse. This type of assembly comports with the definition of the word "bomb" offered by Copus himself: "a container filled with explosive ... material to be set off by impact or by a timing device." (Reply Br. 9). Moreover, the government presented evidence that each detonator was capable of exploding and causing property damage and bodily injury. Thus, there was ample evidence to support a finding that the detonators were "bombs" or "similar devices."

Copus attempts to overcome the straightforward analysis outlined above by relying on the statutory exception to the definition of a "destructive device." The statutory exception states that the definition of a destructive device "shall not include any device which is neither designed nor redesigned for use as a weapon." 26 U.S.C. § 5845(f). Copus argues that there was no proof beyond a reasonable doubt that his home-made detonators were intended to be used as weapons. He contends that, without evidence that he intended to use the detonators as weapons, there was insufficient evidence for the jury to conclude that the detonators were "destructive devices" within the meaning of 26 U.S.C. § 5845(f).

In support of his view that the government had to prove that he intended to use the detonators as weapons, Copus relies on *United States v. Worstine*, 808 F.Supp. 663 (N.D.Ind.1992). In *Worstine*, the defendant was charged with unlawfully manufacturing, possessing, and transferring unregistered firearms, in violation of the National Firearms Act. The government charged that the devices in question qualified as "destructive devices": one was a galvanized metal pipe bomb and the others were explosive devices consisting of 3- to 4-inch plastic PVC tubing containing gun powder and enclosed with PVC end caps.

The district court found that, despite the defendant's claim that he was merely attempting to create a "firecracker" and not any sort of weapon, the galvanized metal pipe qualified as a "destructive device" under § 5845(f). With respect to the PVC devices, however, the court found that they were not clearly designed as weapons and that it appeared that the defendant's subjective intent was indeed to create firecrackers. Based on the totality of the circumstances, including the objective design of the PVC devices and the defendant's alleged subjective intent to create firecrackers, the court concluded that the PVC devices fell within the statutory exception to the definition of a "destructive device." *Id.* at 669.

It is undisputed that, in this circuit, the defendant's subjective intent is relevant to determining whether a "combination of parts" qualifies as a "destructive device" under § 5845(f)(3). *Burchfield v. United States*, 544 F.2d 922, 924 (7th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Tankersley*, 492 F.2d 962, 966 (7th Cir.1974). However, Copus' home-made detonators were fully assembled devices and so § 5845(f)(1) (covering any "bomb" or "similar device") applies rather than § 5845(f)(3).[2] With respect to whether the defendant's intentions are relevant under § 5845(f)(1), *Worstine* does not represent the only view taken by the courts on this issue. *United States v. Morningstar*, 456 F.2d 278, 280 (4th Cir.) (stating in dictum that devices identified in § 5845(f)(1) "are covered regardless of their intended use"), *cert. denied*, 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972); *see also United States v. Markley*, 567 F.2d 523, 527 (1st Cir.1977) (concluding that there was sufficient evidence to support a jury finding

2. Because the detonators were fully assembled devices and hence are covered under § 5845(f)(1) rather than § 5845(f)(3), many of the cases cited by Copus are inapposite. *See United States v. Blackwell*, 946 F.2d 1049 (4th Cir.1991) (deciding whether components in question qualified as a "destructive device" under § 5845(f)(3)); *United States v. Price*, 877 F.2d 334 (5th Cir.1989) (same); *United States v. Fredman*, 833 F.2d 837 (9th Cir.1987) (same).

that the home-made incendiary devices fell within the provisions of § 5845(f)(1) "regardless of their intended purpose"), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978).

Yet even assuming that we were to accept the reasoning of *Worstine,* it does not help Copus. The court in *Worstine* did not hold that the government was *required* to prove that the defendant subjectively intended to use the device in question as a weapon. Rather, the court in *Worstine* merely determined that, where the objective purpose of a device is not clear, the trier of fact *may* look to the defendant's subjective intent, as one element of the totality of the circumstances, to decide whether the device qualifies as a "destructive device." *Worstine,* 808 F.Supp. at 669.

In the present case, our task is not to determine whether we would find that the detonators were designed as weapons if we were sitting as jurors. Rather, on appeal, we must simply determine whether there was sufficient evidence from which a rational jury could conclude that the home-made detonators were designed for use as weapons. The detonators were both built like bombs and were capable of producing bomb-like effects: each consisted of (1) a metal casing containing explosive powder that was epoxied shut and (2) a fuse; and each had the capacity to explode causing both a blast thermal effect and fragmentation, which in turn could cause property damage and bodily injury. Copus stated that he allegedly intended to use the detonators to blow up stumps, but the jury was not required to accept this explanation. Indeed, other evidence casts doubt on Copus' explanation. First, the government presented evidence that the detonators would not be effective in blowing up stumps, which is what Copus claimed was their intended use. Second, Copus had attached detonators to several other explosive devices he had constructed, including grenades, pipe bombs, and a makeshift incendiary device. Given the objective design characteristics of the detonators as well as the evidence undermining Copus' alleged reason for manufacturing the detonators, the record is not devoid of evidence from which a jury could find beyond a reasonable doubt that these devices were designed for use as weapons.

Copus argues that the detonators were not designed for use as "weapons" because the legislative history of the National Firearms Act demonstrates that the prohibitions involving "destructive devices" were aimed at military-type weapons such as mines, grenades, bombs, and large-caliber weapons like bazookas, mortars, and anti-tank guns. His position finds support in *United States v. Posnjak,* 457 F.2d 1110, 1116 (2d Cir.1972). However, we have refused to subscribe to this view. *See Burchfield,* 544 F.2d at 924–25 (components for home-made bomb qualify as "destructive device"); *Tankersley,* 492 F.2d at 966 (same). Nor does Copus' position reflect the prevailing view among the other circuits. *See United States v. Ragusa,* 664 F.2d 696, 699 (8th Cir.1981) (crude, improvised bomb constituted "destructive device"), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982); *Markley,* 567 F.2d at 526–27 (rejecting *Posnjak* view and concluding that home-made bomb could qualify as a "destructive device"); *see also United States v. Peterson,* 475 F.2d 806 (9th Cir.) (incendiary device made from a highway warning flare), *cert. denied,* 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 93 (1973); *United States v. Ross,* 458 F.2d 1144 (5th Cir.1972) (Molotov cocktail).

Copus also argues that his home-made detonators produced a significantly smaller explosive effect than the "bombs" or "similar devices" that Congress intended to prohibit under § 5845(f)(1). The language of § 5845(f)(1) does not support Copus' view that only bombs or similar devices of a certain minimum explosive capacity can qualify as "destructive devices." Section 5845(f)(1) refers to "any" bomb or similar device and fails to limit that language by reference to any minimum explosive charge. In contrast, § 5845(f)(1)(D), which describes the type of missile that qualifies as a "destructive device," specifically refers to a minimum explosive charge. In order to qualify as a "destructive device," a missile must have an explosive or incendiary charge "of more than one-quarter ounce." 26 U.S.C. § 5845(f)(1)(D). The fact that Congress

chose to require a minimum explosive charge for a missile but not for a bomb counsels strongly against reading any such requirement into the statutory language.

The only possible limit we discern from the statutory language is that the device must have been designed or redesigned "as a weapon." In the present case, although the explosive capacity of Copus' detonators may have been smaller than the explosive capacity of a grenade, mine, or military-type bomb, Copus' detonators could qualify as "weapons." The prosecution introduced evidence that an explosion of one of Copus' devices could cause property damage and bodily injury.

Accordingly, we reject Copus' position that the detonators fall under the statutory exception to the definition of "destructive devices" either because they were not "military-type" weapons or because of their smaller explosive capacity. We hold that the evidence presented was sufficient for a rational jury to conclude that the detonators were designed as weapons and otherwise qualified as "destructive devices" under 26 U.S.C. § 5845(f)(1). The jury's implied finding that the detonators were designed for use as weapons resulted in no manifest miscarriage of justice.

## B. Sentencing

■ On appeal, Copus challenges the district court's six-point enhancement of his base offense level. In calculating Copus' adjusted offense level, the district court added six points because the court found that his offense involved fifty or more "destructive devices." See U.S.S.G. § 2K2.1(b) & comment. (n.1). Copus argues that the detonators were not "destructive devices" for purposes of § 2K2.1(b). He maintains that the court should have applied U.S.S.G. § 2K1.3, which deals with "explosive materials," to determine his adjusted offense level. The district court's determination that the detonators were "destructive devices" for the purposes of § 2K2.1(b) involved an interpretation of the Guidelines and their application to the facts. That determination, therefore, is reviewed de novo. See United States v. Holden, 61 F.3d 858, 860 (11th Cir.1995).

U.S.S.G. § 2K2.1(b) provides in relevant part:

(1) If the offense involved three or more firearms, increase as follows:

| | Number of Firearms | Increase in Level |
|---|---|---|
| (A) | 3–4 | add 1 |
| (B) | 5–7 | add 2 |
| (C) | 8–12 | add 3 |
| (D) | 13–24 | add 4 |
| (E) | 25–49 | add 5 |
| (F) | 50 or more | add 6. |

The commentary to § 2K2.1 makes clear that a "firearm" includes "any destructive device." See Application Note 1.

■ Copus argues that the district court should not have considered the detonators as "destructive devices" for sentencing purposes because they differed so greatly from the other types of weapons included as "destructive devices," such as hand grenades and pipe bombs. According to Copus, United States v. Cox, 7 F.3d 1458 (9th Cir.1993), held that § 2K1.3 is the appropriate guideline for an offense such as Copus' because § 2K1.3 covers the unlawful receipt, possession, or transportation of explosive materials.

In Cox, the defendant was convicted of possessing and manufacturing two bombs, in violation of 26 U.S.C. § 5861(d) & (f). One of the bombs was used in an attack on a federal courthouse and caused extensive damage. After calculating the defendant's adjusted offense level, the district court chose to depart upward seven levels. The court added six of the seven levels to account for the destructive nature or capability of the bombs the defendant had possessed and manufactured. The court arrived at the six-level upward departure by analogizing to the loss table in U.S.S.G. § 2B1.1(b)(1) (Larceny, Embezzlement, and Other Forms of Theft).[3]

---

**3.** (1) If the loss exceeded $100, increase the offense level as follows:

| | Loss (Apply the Greatest) | Increase in Level |
|---|---|---|
| (A) | $100 or less | no increase |
| (B) | More than $100 | add 1 |
| (C) | More than $1,000 | add 2 |
| (D) | More than $2,000 | add 3 |
| (E) | More than $5,000 | add 4 |
| (F) | More than $10,000 | add 5 |
| (G) | More than $20,000 | add 6 |

. . . .

On appeal, the Ninth Circuit reversed the sentence because it determined that a more appropriate way to account for the destructive nature or capability of the bombs was by reference to the table in § 2K1.3(b) for weight of explosive materials. *Id.* at 1462. In reaching this conclusion, however, the court stated that the table for the weight of explosive materials was a reasonable analogue for calculating the extent of an upward departure even though § 2K1.3 itself "is not applicable to Cox since he was convicted of separate criminal offenses involving destructive devices." *Id.* Thus, contrary to Copus' position, *Cox* does *not* hold that § 2K1.3 is the appropriate guideline for an offense such as Copus'.

Copus also asserts that neither Congress nor the Sentencing Commission intended that the courts treat small detonator devices the same as machine guns, grenades, or pipe bombs when imposing sentences. However, for the reasons given in Part II.A of this opinion, we reject this argument.

We conclude that the district court did not err in finding that the detonators were "destructive devices" and that the offense involved fifty or more firearms under U.S.S.G. § 2K2.1(b).

### C.  Jurisdiction

Copus was convicted of unlawfully possessing a machine gun, in violation of 18 U.S.C. § 922(*o*),[4] unlawfully possessing a silencer, in violation of 26 U.S.C. § 5861(d),[5] and unlawfully manufacturing a firearm, in violation of 26 U.S.C. § 5861(f).[6] Copus contends that Congress lacked the power to prohibit any of these activities absent proof of an interstate nexus.

Copus bases his argument on *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *Lopez,* the Supreme Court invalidated 18 U.S.C. § 922(q), which prohibited the knowing possession of a firearm "at a place that the individual knows, or has reasonable cause to believe, is a school zone." Copus' argument that the logic of *Lopez* also requires the invalidation of 18 U.S.C. § 922(*o*) is directly foreclosed by our recent decision in *United States v. Kenney,* 91 F.3d 884 (7th Cir.1996).

■ Copus advances the same argument with respect to 26 U.S.C. § 5861(d) & (f). He notes that neither provision contains an element requiring a federal nexus, and that under the reasoning of *Lopez,* both are unconstitutional.

The government argues that *Lopez* does not undermine the constitutionality of § 5861(d) or (f) because those provisions were promulgated pursuant to Congress' power to tax. *See* U.S. Const. art. I, § 8, cl. 1. Specifically, § 5861(d) prohibits an individual from receiving or possessing a firearm not registered to that individual in the National Firearms Registration and Transfer Record in accordance with § 5841. Each transfer of a firearm is subject to a tax of, in most cases, $200. 26 U.S.C. § 5811(a). Section 5861(f) prohibits the manufacture of a firearm without the approval of the Secretary of the Treasury, *see* § 5822, and the payment of a $200 tax, *see* § 5821. Thus, according to the government, Congress' power to tax, rather than its power to regulate interstate commerce, *see* U.S. Const. art. I, § 8, cl. 3, justifies the registration and taxing provisions of the National Firearms Act. *See Sonzinsky v. United States,* 300 U.S. 506, 514, 57 S.Ct. 554, 556, 81 L.Ed. 772 (1937)

---

**4.**  Section 922(*o*) provides:

> (1) Except as provided in paragraph (2), it shall be unlawful for any person to transfer or possess a machinegun.
>
> (2) This subsection does not apply with respect to—
>
> > (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or

> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

**5.**  "It shall be unlawful for any person ... to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." A "firearm" is defined to include "any silencer." 26 U.S.C. § 5845(a)(7).

**6.**  *See supra* note 1.

(federal statute imposing annual license tax on firearms dealers is within the national taxing power).

In reply, Copus argues that Congress' taxing power no longer justifies the registration and taxing provisions relating to § 5861(d) & (f) because, with the passage of 18 U.S.C. § 922, Congress made compliance with § 5861 impossible. Copus relies on *United States v. Dalton*, 960 F.2d 121 (10th Cir. 1992), in which the Tenth Circuit vacated the defendant's conviction under 26 U.S.C. § 5861(d) & (e) for possessing and transferring an unregistered machine gun. The court in *Dalton* reached its decision noting the interplay between various provisions of the National Firearms Act and 18 U.S.C. § 922(o):

> Dalton was convicted of violating two provisions of the [National Firearms Act]: I.R.C. § 5861(d), which prohibits the receipt or possession of an unregistered firearm; and I.R.C. § 5861(e), which prohibits the transfer of a firearm in violation of the applicable transfer provision. The transfer provision requires the transferor to apply for registration of the firearm to the transferee and to pay a transfer tax. *See id.* § 5812. Under 18 U.S.C. § 922(o), however, it is unlawful to transfer or possess the firearm at issue in this case because the weapon was converted into a machinegun after the statute's effective date of May 19, 1986. The NFA specifically provides that all applications to register a firearm will be denied if it is illegal to possess or transfer the weapon. *See* I.R.C. § 5812 (registration application denied "if the transfer, receipt, or possession of the firearm would place the transferee in violation of law"). As a result, compliance with the registration requirements referred to in sections 5861(d) and (e) is impossible with this weapon.

*Dalton*, 960 F.2d at 122–23 (footnotes omitted). The court reasoned that the effect of § 922(o) was to "undercut the constitutional basis of registration" under the NFA. *Id.* at 125. Accordingly, the court concluded that the defendant's convictions, which were based on failure to comply with the registration requirements of the National Firearms

Act, could no longer stand. *Id.* at 126. *See also United States v. Rock Island Armory, Inc.*, 773 F.Supp. 117 (C.D.Ill.1991).

We are not convinced that the logic of *Dalton* leads to the conclusion that Copus' convictions under 26 U.S.C. § 5861(d) & (f) are invalid. The decision in *Dalton* to vacate the defendant's convictions under the National Firearms Act for transferring and possessing unregistered machine guns rested on the fact that 18 U.S.C. § 922(o) prohibited the transfer of all machine guns after May 19, 1986. Here, Copus was convicted of possessing an unregistered silencer (Count II) and unlawfully manufacturing a destructive device (Count III). Copus points to no provision comparable to § 922(o) that bans outright the possession of silencers or the making of destructive devices. Copus has thus failed to show how the logic of *Dalton* applies to his convictions in Counts II and III. Accordingly, we reject Copus' argument that 18 U.S.C. § 922 has undermined the constitutional basis of the taxation and registration requirements related to 26 U.S.C. § 5861(d) & (f).

We conclude that the charges contained in the indictment against Copus were within the jurisdiction of the district court.

## IV. CONCLUSION

The judgment of conviction and sentence are

AFFIRMED.